2022 IL App (2d) 210502-U
No. 2-21-0502
Order filed August 29, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DYNA-KLEEN, INC., | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-AR-67 |
| | ) | |
| EDWARD HORNBECK and | ) | |
| B.R. PROPERTIES, INC., | ) | Honorable |
| | ) | Eugene G. Doherty, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE BRIDGES[1] delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's finding that defendant signed a work/payment authorization was not against the manifest weight of the evidence, and the trial court did not err in finding in favor of plaintiff on its breach-of-contract claim. Therefore, we affirm.

---

[1]Justice George Bridges participated in this appeal and authored this order, but has since been assigned to the Fourth District Appellate Court. Our supreme court has held that the departure of an authoring judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Kinne v. Duncan,* 383 Ill. 110, 113-14 (1943).

¶ 2    At issue in this appeal is whether the trial court erred in finding for plaintiff, Dyna-Kleen, Inc., on its breach-of-contract claim. Defendants, Edward Hornbeck and B.R. Properties, Inc., argue that the trial court erred in finding that Hornbeck signed an authorization for Dyna-Kleen to perform repairs on defendants' property. They further argue that the trial court erred in finding for Dyna-Kleen because the parties did not have a written contract. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On February 14, 2018, Dyna-Kleen filed a two-count complaint against defendants, which was last amended on January 1, 2020. Count I was titled "BREACH OF CONTRACT" and directed against Hornbeck individually. Dyna-Kleen alleged that Hornbeck signed a work/payment authorization (the authorization), which authorized it to repair real estate located at 2724 Kilbourn Avenue in Rockford, Illinois (the property) that had been damaged by fire on or about January 5, 2017. The authorization provided that the work would be done in accordance with the original insurance estimate and any supplemental estimates, and the original estimate was attached as exhibit B. Dyna-Kleen alleged that the work was substantially completed on the property and that Hornbeck had paid it a sum of $25,494.24, but that he had failed to pay an additional sum due of $31,988.82. Dyna-Kleen sought the amount due plus interest and costs.

¶ 5    Count II, titled "QUANTUM MERUIT," was an alternative pleading that sought relief from B.R. Properties, Inc., for the work done on the property in the amount of $31,988.82 plus costs. B.R. Properties was an Illinois corporation, and Hornbeck was its president.

¶ 6    Dyna-Kleen attached the authorization to the complaint as exhibit A. The authorization was titled "WORK/PAYMENT AUTHORIZATION" and began by stating "We authorize Dyna-Kleen Of [*sic*] Rockford, Inc.[(,)] herein-after referred to as contractor, to make repairs to our

property at the address below ***." The authorization listed the insurance company as Country Financial.

¶ 7        At the bottom of the authorization, a line read "Signed at _____ this _9_ day of __1____, 2017." Below the date was a signature for "Ed Hornbeck" next to the label for "Owner." The signature was written in a cursive style.

¶ 8        A bench trial took place on November 16, 2020. Bradley Swigart testified as follows. Dyna-Kleen was a family-owned business, and he had worked there full-time for over 40 years. He currently managed the office and provided estimates for customers. Dyna-Kleen provided a variety of services, including fire and water restoration, industrial cleaning, painting, and carpentry work—almost anything to do with cleaning and construction.

¶ 9        Swigart had gotten to know Hornbeck over the past 10 years. Dyna-Kleen had done some work for him in the past, and they were on "friendly terms." For the work related to this case, he believed that Hornbeck called Dyna-Kleen about doing the work before the insurance company called. Hornbeck called to say that he had had a fire on the property and that he may need help restoring it. The first task that Hornbeck hired Dyna-Kleen to perform was to secure the property and prevent further damage.

¶ 10        Swigart received the insurance company's estimate via email "probably around" January 14, 2017. The insurance company's estimate provided that the total replacement cost for the property was $73,609.88 and the depreciated cost was $59,842.46. Swigart had the insurance company's estimate about one week before Hornbeck because Hornbeck "did not believe in email or text messaging" and instead waited for the estimate via the mail. He offered a copy of the estimate to Hornbeck, but he said he would wait for his copy in the mail. He and Hornbeck ultimately agreed to the depreciated price in part because the property was across the street from

Dyna-Kleen and Swigart did not want to see competition working across the street. When asked whether they eventually put the agreement in writing, Swigart answered no, explaining, "[w]e just agreed to write—you know, work off this insurance estimate."

¶ 11    Counsel then showed Swigart the authorization and asked if he recognized it. Swigart referred to the authorization as an "informal piece of paper that we—an authorization that we have for the insurance companies" to show Dyna-Kleen was authorized to work by the insured. It was something "to get the ball rolling" on their work. He did not prepare the authorization; his secretary prepared it at his direction.

¶ 12    Swigart testified that Dyna-Kleen was able to complete the work on the property, although with a lapse of a couple of weeks. He believed the value of the work provided was right around the original replacement cost estimate of $72,000. Dyna-Kleen used subcontractors for work on the property, and they paid the subcontractors in full.

¶ 13    Counsel next showed Swigart an invoice from Dyna-Kleen to Hornbeck dated July 11, 2017. The itemized invoice showed a balance due of $35,347.65 ($31,988.82 plus seven months interest). The invoice also showed that Hornbeck had paid Dyna-Kleen $25,494.24 on March 3, 2017, which Swigart explained was payment on a prior invoice that Dyna-Kleen had sent Hornbeck halfway through the work on the property.

¶ 14    Hornbeck terminated Dyna-Kleen around June 1, 2017. Swigart heard about the termination from his secretary while he was on a trip in Canada. The work on the property was not complete by June 1, but it would have been after another day or so of work—the property needed carpeting and a final walkthrough, and he needed to finish the cleanup. All structural work had been completed.

¶ 15    Rebecca Box, a former employee of Dyna-Kleen, testified as follows. Counsel showed Box the authorization, and Box identified it, saying she had seen it before when Hornbeck brought it to Dyna-Kleen's office. He physically handed her the authorization. At the time he handed it to her, the document was signed. She assumed the signature was Hornbeck's because he brought the authorization to her. She did not remember the date he brought the authorization to her, but she remembered it was after Dyna-Kleen had started tearing stuff out of the property and had covered the roof with a tarp.

¶ 16    Hornbeck did not say anything to her at first. Instead he asked for Swigart, who was not in at the time. He then asked for Swigart's secretary, but she had taken the day off, and Box was covering the desk for the day. At that point, he said that he was leaving the document he brought, and she left it for the secretary.

¶ 17    Patrick O'Hare was a carpenter and estimator for Dyna-Kleen, and he testified as follows. He was familiar with the property, and the damage to the property was "very substantial," with a lot of roof damage. He was aware that Dyna-Kleen was charging Hornbeck $59,842.46 for work on the property, which was the cash value of the insurance policy, but in his opinion, that was not enough: "Any other job" for the same work "would have been done for $73,609.88." The goal was to do the work for the cash lower cash value, which required effectively cutting some corners to save money, such as the choice of wall material. Dyna-Kleen did the job for a lesser amount as "a favor" to Hornbeck and because the property was across the street from the office. He estimated that Dyna-Kleen performed around 95% of the work it was hired to perform at the property.

¶ 18    Hornbeck testified as follows. He was the president of B.R. Properties, which owned the property. The property was a rental unit that had been damaged in a fire around January 2017. After the fire, he contacted his insurance carrier but did not contact Dyna-Kleen. Someone from

Dyna-Kleen saw the damage across the street, came over, and started doing work. He did not know who came over; he knew that Dyna-Kleen had begun work on the property only because Swigart had called him and told him. When Hornbeck checked on the property after speaking to Swigart, he observed a blue tarp over part of the roof.

¶ 19     His insurance company provided an estimate for his claim on the property. He received the estimate sometime after January 13, 2017. Before he received the estimate, he communicated with Swigart, who expressed that Dyna-Kleen was right across the street from the property and that he preferred to not have someone else rehabilitate the property. Swigart said Dyna-Kleen could complete the work on the property for what the insurance company was going to pay. Swigart had a copy of the insurance estimate before Hornbeck. Their discussion took place either at the property or in Swigart's office. They did not discuss specifics like the type of material or flooring to use.

¶ 20     The insurance coverage for the property was for actual cash value, which was quoted at $59,842.46. Hornbeck had a thousand-dollar deductible, and Swigart told him he could "bury it," which he took to mean that he would not have to pay the deductible. Hornbeck also had rental coverage for the property for a duration of four months, but he did not immediately discuss the four-month rent coverage with Swigart.

¶ 21     When shown the authorization, Hornbeck denied having seen it prior to this litigation. He denied signing the authorization. He testified that his signature usually slanted to the right because he was left-handed. As to the date on the authorization of January 9, 2017, he did not know on January 9 how much the insurance company was going to cover or pay. He had been a real estate broker for 41 years, and he typically did not sign contracts without the entire contract being filled out.

¶ 22    At first, Hornbeck observed Dyna-Kleen workers were at the property a lot, but over time, he observed less activity at the property. Hornbeck asked Swigart about this, and he said he had to take care of a bigger job first. Their conversations were "civil" but Swigart "wasn't very polite and he wasn't very professional." Hornbeck believed Swigart was not getting the job done, and they had several conversations about the progress at the property.

¶ 23    The "ugly" conversations occurred when they were getting close to the four-month mark, which was when Hornbeck's rent subsidy would end. He eventually told Swigart about the rent coverage, and Swigart spoke to the insurance company, telling it that work on the property had run into problems and that he needed more time to finish the job. The insurance company agreed to extend the coverage for a few more months, until the end of June. Hornbeck continued that the majority of work on the front half of the property was nearing completion around the time that the insurance company granted the two-month rent extension, and Dyna-Kleen performed additional work during those additional two months.

¶ 24    Hornbeck terminated Dyna-Kleen sometime in June 2017, which was when it became obvious that the job was not going to be completed by the end of June. He noted that the subfloor was incomplete, and this prevented carpeting the floor. He went to Dyna-Kleen's office to speak with Swigart, but he was on vacation, so he told the secretary that Dyna-Kleen was fired. Dyna-Kleen had not even started work on the back of the house, which was the kitchen, the master bedroom, a bathroom, and the family room. At the time he fired Dyna-Kleen, there was no electricity in the back half of the house. He acknowledged paying Dyna-Kleen the $25,494.24 balance due on the February 27, 2017, invoice.

¶ 25    The trial court issued its decision on May 26, 2021. The trial court first addressed the issue of whether there was a contract between the parties. It found that, more likely than not, Hornbeck

signed the authorization. Although the trial court believed that Hornbeck did not recall signing the authorization, Box remembered him bringing the signed contract. Its conclusion that Hornbeck signed the authorization "was bolstered by the fact that the signature on the document is similar to the other Hornbeck signatures introduced for comparison."

¶ 26 Accordingly, the trial court found there was a contract between Dyna-Kleen and Hornbeck that governed Dyna-Kleen's work. The trial court also noted that the end of the parties' relationship evidenced a contractual relationship, in that Hornbeck fired Dyna-Kleen, and there could be no firing without a relationship to be fired from.

¶ 27 As a consequence of finding a contract between Dyna-Kleen and Hornbeck, the trial court explained that Dyna-Kleen lacked a legal basis for recovery on count II for *quantum meruit*, which was directed against B.R. Properties. It, therefore, found in favor of B.R. Properties on count II.

¶ 28 The trial court continued that although the authorization showed an agreement between the parties to begin repair work on the property, it was not helpful in identifying the terms of the subsequent work. The trial court found that an oral agreement for restoration of the property arose out of the initial written authorization. The authorization did not prohibit oral modifications, and even if it did, the trial court explained that modifications pursuant to oral agreement modifications would be permissible.

¶ 29 Accordingly, the trial court found that while the origin of the parties' contractual relationship arose from the authorization, "the heart of their agreement is an oral modification or extension agreed to between Brad Swigart (on behalf of Plaintiff) and Hornbeck." The agreement provided that Dyna-Kleen would perform the work under the insurance estimate dated January 13, 2017, for actual cash value for the loss, which represented a significant discount from the replacement cost of the work.

¶ 30    The trial court found that the parties were bound by the terms of Hornbeck's insurance estimate. It found that the work Dyna-Kleen performed was in a good and workmanlike manner, but the question remained whether it completed all the work contemplated in the insurance estimate, or whether the parties had agreed to any subsequent departures from the insurance agreement.

¶ 31    After reviewing the testimony of various work performed on the property, the trial court concluded that Hornbeck owed Dyna-Kleen $23,582.37 of the $30,588.32[2] that Dyna-Kleen was claiming. Applying the interest rate under the authorization, which the trial court found was incorporated from the authorization into all subsequent work agreements on the property, the court calculated interest due at $16,448.70. Therefore, Hornbeck owed Dyna-Kleen a total of $40,030.97.

¶ 32    A judgment order was entered on August 2, 2021, providing that for the reasons set forth in the May 26, 2021, memorandum decision, the trial court found in favor of Dyna-Kleen and

---

[2]It is not immediately clear why this claimed value of $30,588.32 differs from the $31,988.82 claimed in the amended complaint, but the parties are not disputing the amount of recovery on appeal and, regardless, Dyna-Kleen's principal recovery of $23,582.37 was for less than either claimed amount.

In addition, in calculating the final amount due, the trial court used the principal value $23,582.27 instead of $23,582.37. The difference is *de minimis*, but we note it for clarification, as one would expect the recovery to be $40,031.07.

against Hornbeck on count I in the amount of $40,303.97,[3] plus costs of the suit. Judgment was entered in favor of B.R. Properties and against Dyna-Kleen on count II.

¶ 33    Defendants timely appealed.

¶ 34                                II. ANALYSIS

¶ 35    Defendants raise three issues on appeal: (1) whether the trial court erred in finding that Hornbeck signed the authorization, (2) whether the authorization lacked the essential elements of an enforceable written contract, and (3) whether parol evidence was required to determine the terms of the parties' agreement. We first address defendants' signature argument and then address their remaining arguments together.

¶ 36                                A. Signature

¶ 37    Defendants argue that the trial court's finding that Hornbeck signed the authorization was against the manifest weight of the evidence. They argue that Dyna-Kleen presented only one witness, Box, to show that he signed the authorization. She testified that she "assumed" the signature on the bottom of the authorization was Hornbeck's because it was him who brought the authorization to her. They also argue that Swigart testified that the authorization was an "informal piece of paper" for the insurance company, allowing work to begin. Defendants emphasize that no witness testified to observing him sign the authorization.

_____

[3]Again, it is not immediately clear why this judgment value differs from the $40,030.97 in the May 2021 decision. If the value were to include additional months' interest, it would include at least the $353.74 monthly interest for both June and July. Most likely it is a typographical error, but the parties do not dispute the judgment amount on appeal.

¶ 38    Defendants continue that Hornbeck testified that he did not sign the authorization. They argue that the signature appearing on the authorization was dissimilar from Hornbeck's normal signature, contending that his signature was usually slanted to the right because he was left-handed. They argue that comparing the signature on the authorization to Hornbeck's signature on other documents admitted at trial shows that the signatures are clearly not the same. In comparing his signature on the authorization to those other documents, defendants argue that several differences are revealed, including a missing loop on the "H" in "Hornbeck" on the authorization signature and that the authorization signature has rounded letters whereas the other documents contain straight and sharp letters.

¶ 39    Defendants further argue that Hornbeck would not have signed the authorization prior to receiving the insurance estimate. The authorization was dated January 9, 2017, but Hornbeck did not receive the insurance estimate until January 13, 2017. Hornbeck testified that he did not sign contracts until they were filled out, and he would not have signed the authorization until it indicated the cost of the work. Defendants contend that, in fact, Hornbeck never even saw the authorization prior to the present litigation.

¶ 40    Dyna-Kleen responds that the trial court correctly found that Hornbeck signed the authorization. It argues that it was not only plausible but logical for the parties to enter into a contract prior to obtaining an insurance estimate. Dyna-Kleen reasons that the property needed to be secured against the elements, that it did not want a competitor working across the street, and that Swigart and Hornbeck had known each other for years. Moreover, it contends that the signature on the authorization resembles other examples of Hornbeck's signatures introduced at trial.

¶ 41    We reject defendants' argument that the trial court erred in finding that he signed the authorization. When acting as the finder of fact, the trial court decides whether a signature is authentic. *Hoxha v. LaSalle National Bank*, 365 Ill. App. 3d 80, 85 (2006). In determining whether a signature is authentic, a court may make handwriting comparisons to proven or disputed handwriting samples, and it need not hear expert opinion. *Id.*; *1601 South Michigan Partners v. Measuron*, 271 Ill. App. 3d 415, 417-18 (1995). A trial court's finding as to the authenticity of a signature is reviewed against the manifest weight of the evidence. *Haffa v. Haffa*, 115 Ill. App. 2d 467, 473 (1969). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 42    Here, the trial court's finding that Hornbeck signed the authorization was not against the manifest weight of the evidence. Box testified that Hornbeck personally delivered the authorization that bore his purported signature to Dyna-Kleen's office, and he left the authorization for Swigart's secretary. Although Hornbeck testified to never seeing the authorization prior to this litigation, it was up to the trial court to assess witness credibility and the weight of the evidence, and we will not substitute our judgment for that of the trial court on these matters unless the opposite conclusion is evident from the record. *1472 N. Milwaukee, Ltd. V. Feinerman*, 2013 IL App (1st) 121191, ¶ 21. The trial court positively cited Box's testimony in support of its finding, and nothing in the record renders Box's testimony unreasonable or unplausible, which itself undercut Hornbeck's testimony that he never saw the authorization prior to this litigation.

¶ 43    The trial court bolstered its finding through handwriting comparisons between the signature on the authorization and several of Hornbeck's signatures on documents admitted at trial. Defendants disagree with the trial court's analysis, arguing that his other signatures reveal

significant differences compared to the signature on the authorization. Although the trial court was not an expert in handwriting analysis, neither is Hornbeck (and neither is this court for that matter), and regardless, the trial court did not need expert testimony to support its finding. See *Hoxha*, 365 Ill. App. 3d at 85. Although we agree with defendants that the signature on the authorization makes subtle departures from Hornbeck's signatures on other documents, all signatures read as "Ed Hornbeck," and we note that there is observable variation even among his signatures on other documents. The differences between the authorization signature and the other signatures, at least to a non-expert's eye, fail to show that the opposite conclusion—that Hornbeck did not sign the authorization—is clearly evident.

¶ 44    Moreover, Swigart's testimony describing the authorization as an "informal piece of paper" does not support defendants' position. The nature of the authorization here has no direct bearing on whether Hornbeck signed it. What Swigart's testimony did support was the position that Hornbeck would have signed an authorization for Dyna-Kleen to work on the property. Swigart characterized the authorization as a form that would "get the ball rolling" by showing the insurance company that the insured, Hornbeck, had authorized Dyna-Kleen to work for him. Swigart testified that his first task was securing the property to prevent further damage, which would logically occur as soon as possible. For several months following the date of the authorization, the parties acted consistent with having an agreement for Dyna-Kleen to work on the property and be paid according to the insurance estimate. Given this as well as the familiarity between the parties at the time, it was not unreasonable for the trial court to believe that Hornbeck would have signed the authorization to begin repair work on the property, even prior to receiving the insurance estimate. Accordingly, the record provides no basis to hold that the trial court's finding was against the manifest weight of the evidence.

¶ 45                              B. Written or Oral Contract

¶ 46    Defendants next argue that the authorization failed to contain the essential elements of a

contract and therefore cannot be considered a written contract under Illinois law. They argue that

the authorization lacks the following essential terms: (1) the agreed upon price; (2) the labor,

materials, and other costs of the project; and (3) payment terms. They argue that even if the

insurance estimate governed the cost of work on the property, the insurance quote had two values

(actual cash value and replacement value), and neither of those values were presented as the

contract price, and if one was supposed to be the price, we cannot know which one. Defendants

assert that "[c]learly the insurance estimate was not relied upon by Plaintiff in performing the

work." As such, they argue that the parties never had a written contract.

¶ 47    Defendants continue that parol evidence was required to determine the agreement between

the parties, necessitating that any contract be treated as an oral contract. Such evidence included

testimony as to conversations between the parties, such as Swigart telling Hornbeck he would

complete the work on the property for the amount the insurance company was going to pay

($59,842.46). Defendants further point to Swigart's testimony that the parties did not put terms in

writing but instead agreed to work off the insurance estimate. They conclude that because the

parties' contract was oral, not written, count I of Dyna-Kleen's complaint must fail because it was

based on breach of a written contract.

¶ 48    Dyna-Kleen responds that although the written authorization between the parties may have

been modified by subsequent oral agreements, the written contract did not cease to exist but instead

remains as the foundation for their initial agreement. It argues that even if some terms in the

authorization were ambiguous, all parties understood that Dyna-Kleen would complete

rehabilitation work on the property for the amount that the insurance company would pay on Hornbeck's claim.

¶ 49    We reject defendants' arguments and hold that the trial court did not err in finding in favor of Dyna-Kleen on count I. The core requirements for the formation of a contract are an offer, acceptance, and consideration. *Franklin v. Nanavati*, 2020 IL App (2d) 190710, ¶ 26. Both oral and written contracts are forms of an express contract, with express contracts being a distinct cause of action from a contract implied in fact. *Cable America, Inc. v. Pace Electronics, Inc.*, 396 Ill. App. 3d 15, 20 (2009). Unless a complaint for breach of contract purports to be based upon a written instrument, it is assumed to be based on an oral contract. *O.K. Electric Company, Inc. v. Fernandes*, 111 Ill. App. 3d 466, 470 (1982). The only additional pleading requirement if a claim is founded upon a written instrument is that a copy thereof must be attached to the pleading or recited therein. *Id.* Failing to allege whether a contract is written or oral does not render a breach of contract complaint legally insufficient. *Id.*

¶ 50    Defendants' arguments are, ultimately, red herrings. They do not dispute the existence of a contract; their position is only that the parties lack an enforceable written contract, and they ask that we consider the parties' agreement to be an oral contract. Defendants have cited no support, nor have we found any, that a complaint alleging breach of a written contract is a distinct cause of action from breach of an oral contract, such that the trial court erred in finding for Dyna-Kleen on count I based in part on the parties' subsequent oral agreements. On the contrary, both written and oral contracts are forms of an express contract (*O.K. Electric Company, Inc.*, 111 Ill. App. 3d at 470), and Dyna-Kleen's complaint sought recovery for breach of the parties' agreement for Hornbeck to pay Dyna-Kleen for repairs to the property. Although defendants cite to case law where the characterization of a contract as oral instead of written affected the application of the

relevant statute of limitations (see, *e.g.*, *Wielander v. Henich*, 64 Ill. App. 2d 228 (1965)), the application of the statute of limitations is not at issue here.

¶ 51    No party has cited the Home Repair and Remodeling Act (Act) (815 ILCS 513/1 *et seq.* (West 2020)), but we find that our supreme court's interpretation of the Act further bolsters our holding. The supreme court examined section 15 of the Act (815 ILCS 513/15 (West 2020)) to determine whether a contractor who violated that provision could still enforce an oral contract or recover in *quantum meruit. K. Miller Construction Company, Inc. v McGinnis*, 238 Ill. 2d 284, 286-87 (2010). Section 15 provided that for home repair over $1000, there must be a written contract stating the total cost, parts, and materials, among other things. 15 of the Act (815 ILCS 513/15 (West 2020)). The supreme court held that in spite of this statutory provision, recovery was available under either theory, explaining that no public policy required holding an oral contract unenforceable or that *quantum meruit* be denied. *K. Miller Construction Company, Inc.*, 238 Ill. 2d at 301. Given that our supreme court permitted recovery on an oral contract even when the relevant statutory provision explicitly required a written contract, we find no reason to require a written contract for Dyna-Kleen to recover on its breach-of-contract claim where defendants cite no authority to support requiring a written contract.

¶ 52    In sum, even if we agree with defendants that the authorization lacked essential terms and that the parties' agreement was oral, the trial court did not err. The trial court found for Dyna-Kleen based on the totality of evidence showing an agreement between Hornbeck and Dyna-Kleen for Dyna-Kleen to perform repairs on the property for the actual cash value set by the insurance estimate. The evidence included the signed authorization and subsequent oral modifications. Whether the agreement was ultimately written or oral is immaterial in this case; the dispositive issue is simply whether there was a contract. Defendants argue *for* an oral contract, and they have

provided no authority to support recovery here for only a written contract. Accordingly, Dyna-Kleen could recover for breach of contract against Hornbeck.

¶ 53                                    III. CONCLUSION

¶ 54    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 55    Affirmed.